UNITED STATES SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated, Plaintiff,<br><br>v.<br><br>MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW<br><br><u>JURY TRIAL DEMAND</u> |

Plaintiff The Public Employees' Retirement System of Mississippi ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by McDermott International, Inc. ("McDermott" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by McDermott; and (c) review of other publicly available information concerning McDermott.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that held McDermott common stock as of April 4, 2018, and had the right to vote on the Chicago Bridge & Iron Company N.V. ("CB&I") merger pursuant to the Proxy Statement dated March 29, 2018 (the Proxy Statement"), and were damaged thereby.

2.     McDermott provides engineering, procurement, construction, installation, and technology solutions to the energy industry.

3.     On December 18, 2017, after the close of the market, McDermott announced it was merging with CB&I pursuant to a stock-for-stock merger (the "Merger"), in which McDermott would be the surviving company.  The combination was subject to a majority vote of McDermott shareholders.

4.     The 2018 Proxy Statement was materially false and misleading and failed to disclose material adverse facts about CB&I and CB&I's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) certain CB&I projects would incur substantially higher costs than publicly represented; (2) the fair value of these CB&I projects would be materially impacted; and (3) as a result of the foregoing, Defendants' positive statements about CB&I's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

5.     Defendants (defined below) disseminated the Proxy Statement to McDermott's shareholders of record as of April 4, 2018, and recommended they approve the Merger at an anticipated shareholder vote on May 2, 2018.  Between March 20, 2018 and May 2, 2018, McDermott filed with the SEC and disseminated other materials to shareholders that were intended to influence the shareholder vote.

6.     The Merger was approved by a majority of McDermott shareholders based on the representations in the Proxy Statement and closed on May 10, 2018.  McDermott shares closed at $20.70 per share on the day of the Merger.

7.     In May 2018, McDermott reported a $221 million change in the value of projects it had acquired from CB&I.  Subsequent thereto, after the close of trading on

October 30, 2018, McDermott reported financial results for third quarter 2018 that fell far below analysts' estimates. Most significantly, the Company reported a $744 million change in the value of projects it had acquired from CB&I. The $965 million aggregate change in value represented more than 50% of the value paid by McDermott to acquire CB&I, measured by the market value of the shares issued by McDermott to CB&I shareholders in the Merger.

8.     On this news, the McDermott's share price fell $5.14 per share, nearly 40%, to close at $7.73 per share on October 31, 2018, on unusually heavy trading volume. The overall decline in value of McDermott common stock from May 10, 2018 to October 31, 2018 was $12.70 per share (or 61.9%).

9.     The bases for the $965 million aggregate decline in value of the CB&I projects was information either known or, but for their negligence, knowable to Defendants at the time of the May 2, 2018 shareholder vote.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n and 78t(a)).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff The Public Employees' Retirement System of Mississippi, as set forth in the accompanying certification, incorporated by reference herein, held McDermott common shares as of April 4, 2018, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant McDermott International, Inc. is incorporated under the laws of Panama with its principal executive offices located in Houston, Texas.   McDermott is a provider of integrated engineering, procurement, construction and installation, front-end engineering and design, and module fabrication services for upstream field developments worldwide. McDermott claims to be "renowned for [its] extensive knowledge and experience, technological advancements, performance records, superior safety and commitment to deliver."  McDermott's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MDR."

17.     Defendant David Dickson ("Dickson") has been the President and Chief Executive Officer ("CEO") of the Company at all relevant times.

18.     Defendant Stuart Spence ("Spence") has been the Executive Vice President and Chief Financial Officer ("CFO") of the Company at all relevant times.

19.     Defendants Dickson and Spence, (the "Individual Defendants, and collectively

with McDermott, the "Defendants") possessed the power and authority because of their

positions with the Company to control the contents of the Company's reports to the SEC and

press releases and presentations to securities analysts, money and portfolio managers, and

institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of

the Company's SEC filings and press releases, alleged herein to be misleading, prior to their

issuance and had ultimate control over the contents of those documents.   Because of their

positions and access to material non-public information, the Individual Defendants knew that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations that were being made were then materially false

and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

### Background

20.    McDermott purports to provide engineering, procurement, construction, and

installation and technology solutions to the energy industry.  McDermott purportedly designs

and builds infrastructure and technology solutions to transport and transform oil and gas into a

variety of products.

21.    CBI provides services including design, technology, engineering, procurement,

fabrication, modularization, construction, and commissioning services to customers primarily in

the downstream energy infrastructure market.

22.    On December 18, 2017, after the close of the U.S. securities markets, McDermott

and CB&I issued a joint press release reporting that the two companies had "agreed to combine

in an all-stock transaction to create a premier fully vertically integrated onshore-offshore

company, with a broad engineering, procurement, construction and installation service offering

and market leading technology portfolio."

23.     From CB&I's perspective, the Merger was in large part motivated by difficulties CB&I had experienced in performance under certain long-term construction contracts.  From December 3, 2016, through December 18, 2017, CB&I's common shares declined in value by 43.56%.  During that same period, McDermott's shares appreciated by 2.71%.  Defendant Dickson alluded to CB&I's difficulties when he was quoted in the press release as stating that: "By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture."

24.     On March 27, 2018, McDermott filed with the SEC Amendment No. 3 to a Form S-4 Registration Statement.  The Explanatory Note to the amendment (page *i*) stated that it contained, among other things, a joint proxy statement that will be used in connection with the special meeting of McDermott shareholders being held on May 2, 2018, and the special meeting of CB&I shareholders being held on May 2, 2018.

25.     The Amendment No. 3 and Joint Proxy/Statement Prospectus were declared effective by the SEC on March 29, 2018, and were mailed to McDermott shareholders of record as of April 4, 2018.  The Merger was subject to a vote of both McDermott and CB&I shareholders, voting separately, pursuant to the Joint Proxy Statement/Prospectus.  The record date for the vote was April 4, 2018.

## The Materially False and Misleading Proxy Statement

26.     The Proxy Statement made repeated assurances that McDermott's management had conducted full due diligence with respect to CB&I's business to assuage McDermott shareholders' concerns that McDermott, by continuing with CB&I, was catching a falling knife. *See*, *e.g.*, Proxy Statement at 58 ("Mr. Freeman, other representatives of McDermott, Ms. David

and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence"); 59 ("On September 13, 2017, members of management of McDermott met with members of management of CB&I in Houston, Texas to conduct mutual due diligence, and to discuss the scale and nature of potential synergies a business combination between the two companies could generate. The parties each preliminarily estimated that a combination of the two companies could result in annualized cost synergies in the range of in excess of $200 million, but agreed that further analysis and information was needed in order to refine the parties' estimate."); 60 ("On October 10, 2017, Messrs. Spence and Taff spoke by telephone to discuss transaction structure, considerations regarding possible financing structure and due diligence. Following this conversation, Messrs. Spence and Taff maintained direct communications and spoke by telephone on several occasions during October and November 2017."); 61 ("On October 24-26 and October 30, 2017, members of McDermott and CB&I management met in Houston, Texas in order to discuss their respective businesses and outlook and detailed business, financial and legal due diligence matters, as well as to discuss the scale and nature of potential synergies related to costs and revenues that could result from a business combination between the two companies."); 62 ("On November 11, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts. Members of McDermott management provided an overview of the potential business combination to date and discussed the proposed transaction structure, the negotiation of the draft Business Combination Agreement, due diligence and next steps. Representatives of Goldman Sachs and Greenhill reviewed financial information on McDermott and CB&I"); 64 ("On November 29, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman

Sachs, Greenhill, Moelis and Baker Botts.  Members of McDermott management provided an update on the status of the proposed business combination, including financial analyses with respect of the two companies, and information about due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing."); 66 ("On December 17, 2017, the McDermott Board held a special meeting in Houston, Texas, attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts.  Members of McDermott management provided an update on the status of the proposed business combination, including financial analysis of the two companies, due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing. Representatives of Goldman Sachs and Greenhill reviewed their respective preliminary financial analyses of the Exchange Offer Ratio.").

27.     The Proxy Statement also incorporated by reference CB&I's disclosures in its 2017 Annual Report on Form 10-K.  CB&I's Form 10-K stated that CB&I had four long-term construction projects on which CB&I recognized revenue and reported income based on estimates of the percentage of the contract completed and the cost to complete. Those contracts were identified in the Form 10-K as "Two Gas Projects" [Calpine and ILP] and "Two LNG [liquid natural gas] Projects" [Cameron and Freeport].   The Form 10-K contained disclosures of changes in estimates with respect to those four contracts during 2017, which had an adverse impact on CBI's financial performance in 2017.

28.     There was nothing stated in the Proxy Statement to indicate that as a result of McDermott's due diligence, or otherwise, that there was anything stated in CB&I's 2017 Form 10-K with respect to the estimates on those four contracts that was no longer accurate.

29.     The Proxy Statement referenced that one member of McDermott's Board of Directors (the "Board") voted against the Merger, and that "Stephen G. Hanks, the dissenting director, did not vote in favor of the transaction due in large part to his stated belief that the business operated by CB&I is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods. *See* 'McDermott's Reasons for the Combination; Recommendation of the McDermott Board—Views of Dissenting Director.'" Proxy Statement at *vii*. *See also* Proxy Statement at 70 ("At each of the meetings of the McDermott Board at which the potential business combination was discussed, Mr. Hanks consistently stated that he believes, based on his prior experience in the engineering and construction (E&C) industry, that the E&C business operated by CB&I (and historically operated by certain of its predecessors) is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods, that these problems may be difficult for McDermott's management to remedy (at least in the near term) and, therefore, that the Combination is too risky for McDermott, taking into account the combined balance sheet of the two companies."

30.     The Proxy Statement (at 70) described McDermott management's response to Director Hanks and the views of the other members of McDermott's Board, which ultimately prevailed in approving the Merger:

> Mr. Hanks also asked detailed questions of McDermott's management team, and McDermott's management, in turn, provided detailed responses and, ultimately, expressed the belief that, based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's

four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management.

31.    Nothing in the Proxy Statement stated that McDermott, McDermott's Board, or Director Hanks disagreed with CB&I's disclosures or accounting treatment in the 2017 Form 10-K for the "loss contracts."

32.    On April 2, 2018, McDermott filed a presentation with the SEC that was part of the Proxy solicitation process related to the Merger.  The presentation stated on page 1 in all capital letters that McDermott and CB&I were "CREATING A PREMIER FULLY VERTICALLY INTEGRATED ONSHORE-OFFSHORE COMPANY DRIVEN BY TECHNOLOGY, INNOVATION AND SCALE."

33.    On April 5, 2018, investment firm Hotchkis & Wiley, an owner of nearly 2% of McDermott's common stock, issued a statement that the CB&I "transaction as currently structured is materially less attractive than what management negotiated," and that "Hotchkis & Wiley plan[ned] to vote against the transaction as currently structured."

34.    Among other things, on February 20, 2018, CB&I had announced that its Engineering & Construction operating group had taken a pre-tax charge of $101 million on four contracts.

35.    On April 5, 2018, as part of the Proxy solicitation process related to the Merger, McDermott issued a "statement" to its shareholders responding to the "recent press release from Hotchkis & Wiley regarding" the proposed combination with CB&I.  The statement assured investors that McDermott management had performed adequate due diligence on CB&I's long-term contracts.  The statement read:

> McDermott is fully committed to completing the transformational combination with CB&I, which the Company's Board of Directors believes is in the best interest

of McDermott and its stockholders. The combination creates a company that spans the entire value chain from concept to commissioning, and is expected to deliver compelling value, make the combined business more competitive and enable a more consistent, predictable performance through market cycles.

*The proven McDermott management model delivers sustainable, profitable growth. By applying this operational excellence across the combined portfolio, we will be a best-in-class integrated solutions provider driven by consistency in systems, processes, execution and culture. This model will benefit stockholders by unlocking value in the near and long term.*

The companies have received all necessary regulatory approvals and are in a position to complete the requisite financing. The combination is expected to close in the second quarter of 2018.

[Emphasis added.]

36.    On April 11, 2018, defendant Stuart Spence, McDermott's Executive Vice President and Chief Financial Officer, issued a statement to employees with respect to the "integration planning efforts" of McDermott and CB&I.  This statement was filed with the SEC and was part of the Proxy solicitation process.  Spence announced that he was the Executive Sponsor of "the Combination Profitability Initiative (CPI)," whose mission was to "identify[ ] inefficiencies, eliminating them post-closing and optimizing the combined business":

As we plan to bring our two companies together, we need to create a platform to drive growth and maximize profit to best position us for future success. We need to take full advantage of our combined capabilities to be successful in this highly competitive market. This means we need to take a hard look at everything we do to make sure we are innovative, efficient and competitive.

To that end, we are developing the Combination Profitability Initiative (CPI) as part of the overall Integration Management Office. This planning initiative focuses on identifying inefficiencies, eliminating them post-closing and optimizing the combined business. We are leveraging our combined expertise to identify cost drivers and develop execution plans to transform the combined business.

During the CPI program, teams from McDermott and CB&I will continue to identify cost efficiency opportunities, plan the associated activities to capture savings and track results after the closing. This effort will provide the strong financial foundation we need to take full advantage of our combined capabilities and drive future growth.

> As the Executive Sponsor of this workstream, I cannot overemphasize the importance of your support for the success of this initiative and the larger integration effort. I believe that together we will be able to profitably grow the combined business while continuing to deliver for our customers around the world.

37.     On April 12, 2018, as part of the Proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed its 2018 guidance originally issued on January 24, 2018, as reaffirmed on February 21, 2018.

38.     The press release stated with respect to the pending acquisition of CB&I that "the integration planning process for McDermott's pending combination with CB&I is progressing well."  Defendant Dickson was further quoted in the press release as saying:

> Our integration planning has given us added confidence in our ability to achieve our stated cost synergy target. Through our work, we have identified expected cost savings in excess of $250 million, which further increases the value of the combination for our stockholders.

39.     The press release further provided the following "update on synergies":

> The companies have validated the identified $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019. The cost synergies are expected to be driven through efficiencies in Supply Chain/Procurement, G&A, Operations and "Other" (i.e., perks, travel, etc.) savings areas. The $84 million in Supply Chain/Procurement savings are expected to be executed through a combination of improved commodity/category buying power and supplier consolidation, as well as improved purchase agreements held by both companies. The $84 million in G&A savings are expected to be achieved through a combination of centralization and/or outsourcing of specific transactional functions and right-sizing the overall corporate support core. The $55 million in operational savings are expected to be executed through pooling of operations support resources in high value centers, facility footprint rationalization and harmonizing project management layers/structures. The $27 million in "Other" savings are expected to be achieved by adopting a more conservative travel and expense policy, eliminating certain benefits/perks and reducing board of directors and insurance costs.
>
> In addition to the $250 million, the companies have identified potential incremental savings of $100 million in savings that our integration teams are working to verify and determine the expected timing to achieve through leveraging McDermott's cost conscious culture on the combined business. These savings are expected to be achieved across G&A, Operations, and Supply Chain/Procurement. With the

implementation of the recently announced plans regarding organizational structure and leadership driving our integration efforts, we have identified potential additional $9 million in G&A, $22 million in operations and $69 million in Supply Chain/Procurement savings. These savings are expected to be executed through similar channels as the original savings and will be included in the overall integration plans. As our executive leadership continues the integration planning, we will remain vigilant in identifying additional opportunities for cost synergies.

40.     On April 16, 2018, Defendants issued a further letter to shareholders as part of the Proxy solicitation process related to the Merger. Defendants assured investors as to their ongoing due diligence and the benefits of the Merger:

We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, deliver compelling value, be more competitive and deliver more consistent, predictable performance through market cycles.

In addition to being underpinned by a compelling strategic rationale, the combination is also expected to deliver substantial financial benefits for stockholders. Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income. The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

41.     On April 23, 2018, Subsea 7 S.A. ("Subsea 7"), a competitor to McDermott, confirmed that it had earlier made an unsolicited offer to acquire McDermott for $7.00 per share (pre-split). McDermott common stock had closed on April 20, 2018 at $6.05 per share.

42.     In response, on April 23, 2018, McDermott issued a press release rejecting Subsea 7's offer. The press release stated in part:

We remain fully committed to completing the transformational transaction and our Board has reaffirmed its recommendation that our stockholders should support it.

43.     On April 24, 2018, as part of the Proxy solicitation process, McDermott issued a press release reporting first quarter 2018 operating results. The headline of the press release read: "Strong Start to 2018 Driven by One McDermott Way."

44.     With respect to the proposed acquisition of CB&I, the April 24, 2018 press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger:

> [O]ur integration teams have identified potential incremental savings of $100 million in addition to the expected $250 million in annualized cost synergies previously announced. We are excited to complete our transformational combination with CB&I so that we can begin integrating our two companies and deliver on the significant value-creating benefits of the transaction.

45.     Also on April 24, 2018, Defendants conducted a conference call with investors to discuss the first quarter operating results.  On the call, defendant Dickson emphasized that McDermott's Board had rejected Subsea 7's "highly contingent" offer because the CB&I merger presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I. McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel. The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I
>
> *        *        *
>
> We're very confident of the combination and we're going to continue on the same path.

46.     Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world."

> We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers. Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.

As we've gotten to know CB&I better over the last 10 months, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

47.    With respect to CB&I's long-term construction contracts, Dickson assured

shareholders that McDermott, through its due diligence, had mitigated the risk to McDermott:

We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project.

These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio.

48.    Dickson also emphasized the benefits to McDermott of the "One McDermott

Way" initiative:  "our strong performance underpinned by the One McDermott Way and our

continuous strategic efforts will position the company well in the short-term and long-term…."

49.    When asked about the Freeport LNG project, Dickson gave assurances to

investors:  "That was all known as we went through the due diligence and it's all subject to

insurance, it is a force majeure situation and CB&I are working with the customer getting

through that, but all in all, I would again emphasize that in our view, Freeport is a good project."

50.    On May 2, 2018, in light on McDermott's opposition to its proposal and the

shareholder vote approving the Merger, Subsea 7 withdrew its $7.00 offer (pre-split).

51.    On May 10, 2018, the Company announced that McDermott shareholders had

overwhelming approved the Merger with CB&I.  Of the approximately 285.9 million shares

eligible to vote, 219.3 million shares participated in the vote, of which 209.2 million shares voted

in favor of the Merger (approximately 95.4% of the shares participating in the vote), 9.8 million

shares voted against the Merger, and 227,000 shares abstained.    As a result of the Merger, McDermott stockholders owned approximately 53% -of the combined business on a fully diluted basis, and CB&I shareholders owned approximately 47%.

52.    The above statements identified in ¶¶26-49 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) certain CB&I projects would incur higher costs; (2) the fair value of these CB&I projects would be materially impacted; and (3) as a result of the foregoing, Defendants' positive statements about CBI's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

53.    Immediately prior to the Merger on May 10, 2018, McDermott shares split one-for-three.  Thus, for example, a holder of 300 McDermott shares with a closing market price of $6.64 per share on May 9, 2018, exchanged those shares for 100 shares of McDermott common stock (post-split), which closed on May 10, 2018 at $20.70 per share.  CB&I shares closed on May 10, 2018, immediately prior to the merger, at $16.39 per share.  CB&I shareholders received 0.82407 McDermott shares in the merger.

54.    According to the Proxy Statement (at *xiii*), approximately 102.5 million shares of CB&I common stock were outstanding as of March 26, 2018.  Thus, the market value of the shares issued to CB&I shareholders on May 10, 2018, approximated $1.75 billion (a 0.82407 conversion ratio multiplied by a $20.70 per share market price multiplied by 102.5 million shares).

55.    On July 31, 2018, the Company issued a press release to announce its financial results for the second quarter 2018, in which it reported a $221 million change to the estimated

costs associated with three projects it had acquired from CB&I. The Company, in relevant part, stated:

> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded the fair value of the CB&I balance sheet, including identified intangible assets and updated cost estimates on the acquired backlog. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, McDermott did record changes in estimated costs on three projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on the Company's net income for the second quarter.
>
> "We are clearly disappointed with the increased cost estimates for three of the legacy CB&I projects," said Dickson. "The increases are within the bounds of the scenarios we contemplated during our due diligence, and we believe that by applying our disciplined One McDermott Way to these projects, we can bring them to successful completion. We have already made significant changes to personnel, reporting structures, stakeholder relationships and execution plans on Cameron, for example, since the combination closed, and there are encouraging signs that these changes have made a difference. More importantly, we have moved forward to further strengthen our relationships with stakeholders. Going forward, we plan to continue to aggressively apply our McDermott approach to ensure appropriate risk evaluation and mitigation across the combined Company's portfolio – from bidding to execution."

56.     Defendants had failed to disclose in the Proxy Statement that McDermott had contemplated these changes in estimated costs during due diligence.

57.     The same day, the Company filed a quarterly report on Form 10-Q for the period ended June 30, 2018, which affirmed the financial results reported in the press release.

**Disclosures on October 30, 2018**

58.     On October 30, 2018, the Company issued a press release to announce its third quarter 2018 financial results. Defendants shocked investors by stating in the press release that it was taking $744 million in additional charges on three CB&I legacy projects to account for cost overruns, "including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project and $68 million on the Calpine gas power project." These charges were more than

three-times greater than the $221 million charge taken in the second quarter, and combined for a

total of $965 million in charges that were not disclosed in the Proxy Statement. Those charges,

in the aggregate, exceeded one half of the $1.75 billion in value paid to CB&I shareholders in

connection with the Merger (as measured by the market value of shares issued to CB&I

shareholders).

59.     The press release stated, in relevant part:

"After five months of ownership, we now believe we have a thorough and definitive
understanding of the schedule and cost position on each of the projects – and clear
visibility into the operational and financial path to completion," said Dickson. "We
have taken significant steps to address performance issues on the three projects.
Specifically, we have installed a new executive leadership team – including our
new Chief Operating Officer and the Area Senior Vice President announced with
the Combination – and made improvements in reporting structures, execution plans,
forecast cost-base methodology and the flow of communication with our
consortium members and customers. We expect no further material changes in the
cost estimates on these projects. Additionally, significant progress has been made
on the remaining projects in the portfolio and we have identified no additional
projects with significant remaining execution risk."

Additional detail about the status of each project as of the end of the third quarter
of 2018 is presented below.

Cameron LNG Project – the changes in estimates followed a detailed reassessment
of the schedule and cost base. The analysis included a comprehensive review of the
work to go, including work for which we may not be compensated -- such as rework
-- and a reduction in productivity estimates. The reassessed schedule and estimates
reflect regional limitations on labor availability and quality, the elimination of an
incentive opportunity and the addition of liquidated damages associated with the
completion schedule. Operationally, the project continues to progress well, with
commencement of commissioning expected in the fourth quarter and first LNG
expected in the first quarter of 2019. As of the end of the third quarter of 2018, the
project was 83% complete and had approximately $557 million of McDermott's
portion of expected revenues to go until expected completion. During the quarter,
the Cameron LNG project contributed $191 million to revenues and ($34) million
to cash flows from operations. Phase 1 of the Cameron project is scheduled for
completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019
and Q1 2020, respectively.

Freeport LNG Project – the changes in estimates followed a detailed reassessment
of the schedule and cost base and a reduction in forecasted labor productivity
resulting from regional limitations on labor availability and quality. The change in

estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, to include liquidated damages associated with the pre-Hurricane Harvey schedule. The updated forecast is based on rigorous reassessments and views by project teams and site management, including the area supervisor's assessment of work to go. At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622 million of McDermott's portion of expected revenues to go until completion. During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115) million to cash flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

Calpine Gas Turbine Power Project – the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%. The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees. The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable. First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations. As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

60.     Defendants did not contend that any of the information reflected in this extraordinary write-off was unavailable to the Defendants when they disseminated the Proxy Statement or made other statements integral to the Proxy solicitation process with respect to the Merger, nor did Defendants explain why this due diligence had not been conducted prior to the CB&I acquisition.

61.     Defendants were negligent in failing to estimate and disclose the need for these charges in the Proxy Statement and other related materials.  Defendants should have disclosed either the magnitude of the charges or that they lack the expertise or ability to conduct due diligence to make an accurate assessment of these charges.

62.     Following the disclosures, an analyst from UBS wrote in an analyst report that the "additional cost overruns are surprisingly large, and we presume that MDR will now have a different business than what it envisioned when it agreed to acquire CBI."

63.     On this news, the Company's share price fell $5.14 per share, nearly 40%, to close at $7.73 per share on October 31, 2018, on unusually heavy trading volume.

64.     McDermott shares and CB&I shares converted to McDermott shares declined from $20.70 per share on May 10, 2018, to $7.73 per share on October 31, 2018 — a decline of $12.97 per share (or 61.9%).  Thus, the Merger with CB&I resulted in an astonishing loss in value to McDermott's legacy shareholders of $1.18 billion based on McDermott's approximately 286 million shares outstanding (pre-split) at the time of the merger (286 million shares divided by 3 and then multiplied by $12.97 per share).

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the class, consisting of all persons and entities that held McDermott common stock as on April 4, 2018, who had the right to vote on the CB&I merger and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company at relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  As of April 4, 2018, approximately 286 million shares of McDermott common stock, each with the right to vote, were outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

McDermott or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants in the Proxy Statement or in other Proxy-related materials omitted and/or misrepresented material facts about the business, operations, and prospects of McDermott; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### Thereunder Against All Defendants

71.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     On March 29, 2018, McDermott filed its Proxy Statement with the SEC, which was subsequently mailed to McDermott and CB&I shareholders of record as of April 4, 2018. The Proxy Statement solicited proxies from McDermott shareholders to vote in favor of the Merger at a special meeting to be held on May 2, 2018.  Each share of McDermott common stock was to be split one for three, and each share of CB&I common stock was to be exchanged for 0.82407 shares of McDermott common stock.

73.     This Count is asserted against the Defendants under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Plaintiff and the members of the proposed Class who were damaged thereby.

74.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[it] shall be unlawful for any person by use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. §78l(1)]."

75.     SEC Rule 14a-9, 17 C.F.R. §240.14a(9), promulgated pursuant to Section 14(a), prohibits the issuance of any Proxy Statement "which, at the time and in light of the circumstances under which it is made, is false and misleading with respect to any material fact,

or which omits to state any material fact necessary to make the statements therein not false or

misleading or necessary to correct any statement in any earlier communication with respect to

the solicitation of a proxy for the same meeting or subject matter which has become false or

misleading."

76.     In the Proxy Statement, Plaintiff and other members of the proposed Class were

solicited to vote to approve the Merger between McDermott and CB&I.  A shareholder vote was

required to approve this proposal.  Consequently, the Proxy Statement was an essential link in

the accomplishment of this proposal.

77.     Defendants provided information that was contained in the Proxy Statement,

allowed their names to be used in conjunction with the Proxy Statement and solicitation of votes,

had a substantial financial interest in the outcome of the votes being sought by the Proxy

Statement, solicited votes under the Proxy Statement, and caused the Proxy Statement to be

disseminated to the Plaintiff and the other members of the proposed Class through the use of the

United States mails and the means and instrumentalities of interstate commerce.

78.     Defendants solicited approval for the Merger from the Plaintiff and other

members of the proposed Class by means of a Proxy Statement which contained false and

misleading statements, concerning, *inter alia,* the Merger and its benefits to shareholders and the

issues with CB&I's projects, while also omitting to state material facts which were necessary to

make their statements contained therein not false or misleading.  Defendants made other public

statements, as alleged herein, subsequent to the mailing of the Proxy Statement that were

similarly false and misleading and were intended to influence the shareholder vote.

79.     The misrepresented or omitted facts are material because under all the

circumstances, there is a substantial likelihood a reasonable shareholder would consider the false

and misleading statements or omitted facts important in deciding how to evaluate the issues and opinions described in the Proxy Statement, or a material part of the mix of information available to the Class members in determining how to exercise their voting rights.

80.    Plaintiff and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger.

81.    None of the materially false and misleading statements contained in the Proxy Statement, or material matters omitted from the Proxy Statement, as described above, were known to the public (including Plaintiff) at the time the vote on the Merger occurred.

82.    Defendants violated §14(a) of the Exchange Act and Rule 14a-9 by issuing the false and misleading Proxy Statement to solicit and obtain the votes of the McDermott shareholders to approve the Merger.  In their Proxy Statement, Defendants made what they knew or should have known were untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

83.    Plaintiff and other members of the proposed Class have suffered damages as a result of the Merger, which was approved through the use of the Proxy Statement in violation of Section 14(a) of the Exchange Act of and Rule 14a-9 promulgated thereunder.

84.    As a consequence of the foregoing, Plaintiff and the other members of the proposed Class have been damaged.

85.    Plaintiffs and the Class are entitled to damages.

### COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

86.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

87.     As alleged herein, the Individual Defendants acted as controlling persons of McDermott within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and then disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the transactions giving rise to the securities violations as alleged herein, and exercised the same.

89.     McDermott and the Individual Defendants each violated Section 14a and Rule 14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

90.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

91.     Plaintiffs and the Class are entitled to damages.

## PRAYER FOR RELEIF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(c)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  January 14, 2019                                WOLF POPPER LLP

By:  _____
         Jeffrey W. Chambers
         Pennzoil Place
         711 Louisiana, Suite 2150
         Houston, TX  77002
         (713) 438-5244
         jchambers@wolfpopper.com

                                                                  *Liaison Counsel for Plaintiff*

OF COUNSEL:

WOLF POPPER LLP
Robert C. Finkel
Sean Zaroogian
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
rfinkel@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiff*